IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF GEORGIA
AUGUSTA DIVISION

U.S. DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA

LAKISHA ANN DOCTOR,                *
                                   *          SEP  5 2025
       Plaintiff,                  *
                                   *              FILED
       v.                          *    CV 123-143
                                   *
CENTER FOR PRIMARY CARE,           *
P.C.,                              *
                                   *
       Defendant.                  *
                              _____

                         O R D E R
                      _____

     Before the Court are Defendant's motion for summary judgment
(Doc. 34) and affidavit in support of its request for attorney's
fees (Doc. 43) pursuant to the Court's March 28, 2025 Order
imposing sanctions (Doc. 42).   For the following reasons,
Defendant's motion for summary judgment is **GRANTED**, and the
requested attorney's fees are awarded.


                       I. BACKGROUND

     Defendant is a large medical practice with multiple clinic
locations in the Central Savannah River Area.  (Doc. 37-2, at 1.)
This action arises out of events occurring during the final ten
months of Plaintiff's employment with Defendant, which lasted from
2015 until her voluntary resignation in April 2022.  (Doc. 35, at
2, 10; Doc 37, at 2; Doc. 37-2, at 22.)

Plaintiff began working at Defendant's Crossroads clinic location in Augusta, Georgia, as a certified medical assistant ("CMA") in January 2015 before moving to the Gateway clinic later that year. (Doc. 35, at 2; Doc. 37, at 2.) Plaintiff's job duties included scheduling patients, returning patient phone calls, taking blood draws, checking patient vitals, and handling authorizations. (Doc. 37-2, at 5.) She was promoted to a clinical supervisor position in the spring of 2021, and it became her job to "oversee the back office" of the Gateway clinic in addition to her duties as a CMA. (Id.) During Plaintiff's time at the Gateway clinic, Dr. Michael Friedman served as the clinic's medical director. (Doc. 35, at 3; Doc. 37-2, at 5.) Plaintiff primarily served as Dr. Robert Suykerbuyk's CMA. (Doc. 35, at 3; Doc. 37-2, at 5-6.)

When the Gateway office manager, Sheila Culbreath, transferred to the corporate office in 2021, Defendant did not immediately fill the office manager position. (Doc. 35, at 3; Doc. 37-2, at 6.) Defendant contends Culbreath's responsibilities at Gateway were "picked up" by several employees, including Plaintiff. (Doc. 35, at 3.) Plaintiff maintains that she was the interim office manager from the time Culbreath left until the time Culbreath's replacement, Jennifer Mott, was hired on July 26, 2021. (Doc. 35, at 3; Doc. 37-2, at 6-7.) Dr. Suykerbuyk and Dr. Friedman both thought Plaintiff did a good job covering Culbreath's

responsibilities.  (Doc. 37-1, at 1; Doc. 34-12, at 5; Doc. 34-5, at 10.)

Though Mott resigned less than three months after taking the office manager position due to her husband's military relocation, much of Plaintiff's claims arise out of Mott's alleged conduct during this short time.  (Doc. 35, at 3-4; Doc. 37-2, at 7.) Plaintiff, who is African American, states that during these three months, Mott was unprofessional and unfriendly and spoke to Plaintiff with a "loud pitch."  (Doc. 35, at 4; Doc. 37-2, at 7.) She claims Mott sporadically threatened to demote her; did not allow her to participate in the hiring or training process for two medical assistants whom she was to supervise, Latoya Epley and Elizabeth Brockman; and told Epley and Brockman not to listen to her.  (Doc. 35, at 4-5; Doc. 37-2, at 8-10.)  Mott took Epley and Brockman to lunch but did not invite Plaintiff.  (Doc. 37-2, at 7.)  Mott told Epley and other staff members she was "trying to get rid of" Plaintiff.  (Doc. 38-2, at 2; Doc. 37-2, at 10.)  Mott sporadically told Plaintiff to work in the front office, despite the front office already being covered; would ask Plaintiff questions while Plaintiff was handling patients; and once asked Plaintiff to go outside when using an inhaler.  (Doc. 37-2, at 9-10.)  Mott also sometimes got frustrated if someone was trying to help her or reacted negatively if anyone disagreed with her.  (Id. at 7.)

3

Plaintiff believes Mott called her the "n-word" on two separate occasions at work, though she is not "100 percent sure" that is what Mott said. (Id. at 17-18.) Plaintiff contends the first occasion was shortly after Mott began the office manager position and happened as Plaintiff was exiting her office. (Id. at 18.) Plaintiff contends the second occasion occurred a few weeks later, around August 2021, as she was walking away after showing Mott how to use a correct vial for the office's COVID clinic. (Id.) That time, Plaintiff thought she heard Mott preface the n-word with "stupid." (Doc. 37-1, at 3.) Other employees heard Mott use racial slurs, some directed toward Plaintiff, on other occasions: Epley gave a sworn declaration stating she heard Mott call Plaintiff "a lazy ass black bitch" early on in Mott's employment. (Doc. 38-2, at 2.) Brockman offered a sworn declaration that after Mott left the office manager position, while Mott and Brockman were eating dinner at a Mexican restaurant, Mott used the n-word in reference to Plaintiff's behavior. (Doc. 34-7, at 3.) Brockman also heard Mott refer to a biracial employee as a "wigger." (Doc. 20-2, at 31; Doc. 38-8, at 06:36.) When asked in her deposition why she believed Mott was racist, Plaintiff did not mention she knew Mott had called her a "lazy ass black bitch" to Epley. (Doc. 20-2, at 20-21.) Plaintiff was not aware of any of the incidents Brockman described until after Plaintiff left her employment with Defendant. (Id. at 43.)

On September 14, 2021, Mott issued Plaintiff a written warning for incidents that occurred on September 8, 9, and 13, 2021. (Id. at 178.) The written warning states,

> When asked a question, there is a constant attitude, and questioning behind it. Today [Plaintiff] was asked if she knew who had UA containers as a side job, her response was not heard and when asked, 'excuse me' for clarification, she responded with 'no, N.O'. Conversations have been had with multiple providers as well as staff members who feel that tension, disrespect, and unprofessionalism need to stop. It has been reported that [Plaintiff] is very unapproachable and has a negative attitude when it comes to assisting her coworkers.

(Id.) The warning identified several provisions of the employee handbook that Plaintiff's conduct violated. (Id.) Under the heading, "Corrective Action Plan," the warning says Plaintiff "is expected to work on her communication skills and sometimes unprofessional attitude." (Id.) Plaintiff, Mott, and Taliah Turner, Defendant's human resources ("HR") field manager, signed the warning. (Id.; Doc. 34-15, at 24.) That same day, Plaintiff complained to Turner about Mott. (Doc. 20-2, at 20-21; Doc. 34-15, at 10, 22; Doc. 37-1, at 6.) According to Turner, Plaintiff told her Mott would "purposely pick at her" and "set [her] up to fail," and Plaintiff felt Mott's conduct was driven by racism. (Doc. 34-15, at 10.) Plaintiff contends she also told Turner she thought Mott had called her the n-word. (Doc. 20-2, at 20.) Plaintiff avers Turner later told her she "might as well suck it

up" because of Mott's impending departure.  (Id. at 47; Doc. 34-15, at 11.)

On September 16, 2021, Brockman sent an email to Mott and Turner documenting a conversation they had the day before about Plaintiff, who was Brockman's back-office supervisor.  (Doc. 34-7, at 5.)  Brockman's email noted Plaintiff's "negative attitude" toward Brockman and others, stated she felt she was not "receiving the adequate help needed" and that "[a]s a clinic manager it seems to be a bother [for Plaintiff] to even help train," and said there is a "shift in attitude form [sic] other staff members when [Plaintiff] isn't here."  (Id.)  Plaintiff contends Brockman told her that Mott prepared the email, but Brockman avers in her sworn declaration that while she asked Mott to review and edit the email, it "accurately reflected [her] concerns about [Plaintiff] at the time."  (Doc. 37-2, at 13; Doc. 34-7, at 2.)

On September 19, 2021, Epley also complained about Plaintiff to Defendant's HR department and sent an email to Mott documenting her complaints.  (Doc. 37-2, at 12.)  Epley's email stated, "Every time [Plaintiff] was asked to do something by [Mott] she would wait till [Mott] left & then speak very loudly about how she hated working there [at] the clinic."  (Doc. 34-8, at 3.)  Epley felt Plaintiff was "VERY unprofessional & showed lack of respect" by "always . . . making remarks after [Mott] left."  (Id.)  Further, she wrote, "I DO NOT feel comfortable asking [Plaintiff] for

help. . . . [W]hen . . . I do ask more then [sic] once on how to do something she huffs [and] speaks to you as though your [sic] dumb." (Id.) In or around November 2021, after Mott resigned, one of Defendant's employees, Tonya Adams, told Plaintiff Mott had asked her to submit an HR complaint against Plaintiff earlier that fall, but Adams refused to do so. (Doc. 20-2, at 39-40.)

Plaintiff admits she did not respect Mott and tried to limit her conversations with her. (Doc. 35, at 6; Doc. 37-2, at 11; Doc. 20-2, at 70.) She told coworkers she was "going to test [Mott's] ass every chance I get." (Doc. 37-2, at 11; Doc. 20-2, at 70-71.) She also called Mott a "bitch" in conversations with coworkers. (Doc. 37-2, at 11.)

After Mott resigned in October 2021, Defendant publicly posted the vacant office manager position. (Doc. 37-2, at 22.) The job listing included the following requirement: "Experience: Five (5) years + experience in Medical management as a minimum." (Id.) The Parties dispute the interpretation of that requirement: Defendant asserts it meant candidates needed five or more years of management experience, but Plaintiff contends it meant the posting "required five years of work experience and some experience in medical management." (Id.) Plaintiff, who had more than five years of work experience but less than one year of medical management experience, applied. (Id. at 22-23.)

Defendant's HR department screened the office manager applicants, while Dr. Friedman conducted final interviews and made the final hiring decision. (Id. at 23.) Dr. Friedman was not provided Plaintiff's application to consider for an interview. (Id.) However, he did not believe she was ready for the office manager position. (Id.; Doc. 34-5, at 9.) Defendant interviewed other candidates, including an internal applicant named Sarah Braddock, who was a quality care coordinator with no previous managerial experience. (Doc. 38-4, at 1-2.) Braddock, who is Caucasian, interviewed with Defendant's CEO and shadowed Mott for two days before Defendant informed her that she did not have sufficient managerial experience for the position. (Id. at 2; Doc. 37-2, at 25.) Defendant's CEO told Braddock that working in a back or front office supervisory position would give her the leadership experience needed to land a managerial role. (Doc. 38-4, at 2.) Defendant ultimately extended offers for the office manager position to three different candidates, each of whom had more managerial experience than Plaintiff. (Doc. 37-2, at 24-25.)

Plaintiff submitted a resignation letter to Defendant's HR department on January 28, 2022, stating she would be resigning her clinical supervisor position on March 4, 2022. (Doc. 20-2, at 193.) Her resignation letter said, "Working here has definitely been a great learning experience . . . . The staff has been like family and that means a lot to me." (Id.) It did not mention she

8

was subjected to harassment or discrimination. (Id.) Plaintiff retracted her resignation, however, when the job she was planning to take fell through. (Id. at 56-57.) She then submitted another resignation letter on March 25, 2022, stating her last day would be April 8, 2022. (Id. at 192.) Plaintiff began work as a clinical instructor at Miller-Motte College on April 11, 2022. (Id. at 5.) In her exit interview survey, submitted April 10, 2022, Plaintiff noted her supervisor did not demonstrate fair and equal treatment, but she did not allege she was subjected to racial discrimination. (Doc. 38-1, at 7-8.)

Plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") on October 12, 2022, and received an EEOC Right to Sue letter on July 5, 2023. (Doc. 1, at 10, 12.) Plaintiff initiated this action on October 2, 2023. (Id. at 3.) Her amended complaint, filed October 26, 2023, asserts claims of race discrimination, retaliation, and punitive damages under 42 U.S.C. § 1981. (Doc. 5, at 10-14.) On July 23, 2024, Defendant moved for sanctions based on Plaintiff's false deposition testimony and failure to timely disclose medical records relevant to her claimed damages. (Doc. 20.) The Court found sanctions appropriate and awarded Defendant attorney's fees and costs incurred in subpoenaing those records and litigating the motion for sanctions. (Doc. 42, at 15.) Defendant requested $14,925.05 in fees and costs and submitted an affidavit and billing

records in support. (Docs. 43, 43-1.) Plaintiff filed no objection to Defendant's requested amount.

On October 21, 2024, while its motion for sanctions remained pending, Defendant moved for summary judgment on all counts. (Doc. 34.) Plaintiff responded in opposition, and Defendant replied in support. (Docs. 37, 41.) The Clerk of Court gave Plaintiff notice of the motion for summary judgment and informed her of the summary judgment rules, the right to file affidavits or other materials in opposition, and the consequences of default. (Doc. 36.) For that reason, the notice requirements of Griffith v. Wainwright, 772 F.2d 822, 825 (11th Cir. 1985) (per curiam), are satisfied. Defendant's motion is therefore ripe for the Court's review.

## II. MOTION FOR SUMMARY JUDGMENT

The Court first addresses Defendant's motion for summary judgment (Doc. 34).

### A. Legal Standard

Summary judgment is appropriate only if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). Facts are "material" if they could "affect the outcome of the suit under the governing [substantive] law," Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986) (citation omitted), and a dispute is genuine "if the nonmoving party has produced evidence such that a

10

reasonable factfinder could return a verdict in its favor," Waddell v. Valley Forge Dental Assocs., Inc., 276 F.3d 1275, 1279 (11th Cir. 2001) (citation omitted).    The court must view factual disputes in the light most favorable to the non-moving party, Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986), and must draw "all justifiable inferences in [the non-moving party's] favor," United States v. Four Parcels of Real Prop., 941 F.2d 1428, 1437 (11th Cir. 1991) (en banc) (internal punctuation and citations omitted).    The court should not weigh the evidence or determine credibility.    Anderson, 477 U.S. at 255.

The moving party has the initial burden of showing the court, by reference to materials on file, the basis for the motion. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).    When the non-movant has the burden of proof at trial, the movant may carry the initial burden in one of two ways: by negating an essential element of the non-movant's case or by showing that there is no evidence to prove a fact necessary to the non-movant's case.    See Clark v. Coats & Clark, Inc., 929 F.2d 604, 606-08 (11th Cir. 1991) (explaining Adickes v. S.H. Kress & Co., 398 U.S. 144 (1970) and Catrett, 477 U.S. 317).    If — and only if — the movant carries its initial burden, the non-movant may avoid summary judgment by "demonstrat[ing] that there is indeed a material issue of fact that precludes summary judgment."    Id. at 608.    The presence of any genuine issue of material fact renders summary judgment

11

inappropriate. <u>United States v. 5800 SW 74th Ave.</u>, 363 F.3d 1099, 1101 (11th Cir. 2004).

## B. Discussion

The Court now turns to the Parties' arguments for each of Plaintiff's claims.

### 1. Count One: 42 U.S.C. § 1981 Race Discrimination

Plaintiff asserts Defendant racially discriminated against her by subjecting her to a hostile work environment and refusing to consider her application for the permanent office manager position. (Doc. 5, at 10-12.)

#### a. *Hostile Work Environment*

Plaintiffs asserting a § 1981 hostile work environment claim must prove "the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." <u>Miller v. Kenworth of Dothan, Inc.</u>, 277 F.3d 1269, 1275 (11th Cir. 2002) (quoting <u>Harris v. Forklift Sys., Inc.</u>, 510 U.S. 17, 21 (1993)).[1]  Race-based hostile work environment claims require the plaintiff to establish

> (1) that he is a member of a protected class; (2) that he was subjected to unwelcome racial harassment; (3) that the harassment was based on his race; (4) that the harassment was severe or pervasive enough to alter the

---

[1] While <u>Miller</u> is a Title VII case, "Section 1981 has the same requirements of proof and uses the same analytical framework as Title VII." <u>McNeal v. City of Tarrant</u>, 325 F. App'x 794, 796 (11th Cir. 2009) (citation and internal quotation marks omitted).

terms and conditions of his employment and create a
discriminatorily abusive working environment; and (5)
that the employer is responsible for the environment
under a theory of either vicarious or direct liability.

_Adams v. Austal, U.S.A., L.L.C._, 754 F.3d 1240, 1248-49 (11th Cir.

2014) (citation omitted). Defendant does not dispute Plaintiff

belongs to a protected class and was subjected to unwelcome race-

based harassment. (Doc. 34, at 16-20.) This claim therefore

hinges upon the fourth and fifth elements: whether the harassment

was sufficiently severe or pervasive, and whether Defendant is

liable for the harassment.

The severe and pervasive requirement involves a subjective

and an objective component. _Adams_, 754 F.3d at 1249. "To satisfy

the subjective requirement, a plaintiff must subjectively perceive

the hostile work environment to be abusive." _Copeland v. Ga. Dep't_

_of Corr._, 97 F.4th 766, 775 (11th Cir. 2024) (citation and internal

quotation marks omitted). Defendant, conceding for the purposes

of its motion that Plaintiff meets the subjective component,

disputes whether the alleged harassment was objectively severe or

pervasive. (Doc. 34, at 17.) Plaintiff asserts Mott's use of

racial slurs and attempts to "sabotage" Plaintiff's employment,

along with Defendant's failure to address Plaintiff's HR

complaints, establish the harassment was objectively severe.

(Doc. 37, at 11-14.)

To determine if harassment is objectively severe, courts "examine the conduct in context, not as isolated acts, and determine under the totality of the circumstances whether the harassing conduct is sufficiently severe or pervasive to alter the terms or conditions of the plaintiff's employment and create a hostile or abusive working environment." Adams, 754 F.3d at 1250 (citation omitted). Relevant to this analysis are "(1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's job performance." Austin v. City of Montgomery, 196 F. App'x 747, 751 (11th Cir. 2006) (citation omitted). However, "no single factor is required." Elite Amenities, Inc. v. Julington Creek Plantation Cmty. Dev. Dist., 784 F. App'x 750, 753 (11th Cir. 2019) (citation omitted). The objective assessment must be done "from the perspective of a reasonable person in the plaintiff's position, knowing what the plaintiff knew." Adams, 754 F.3d at 1250 (citation omitted). "Petty office squabbles, communication issues, and 'ordinary workplace tribulations' are insufficient to create a hostile work environment." Hausberg v. Wilkie, No. 8:20-CV-2300, 2021 WL 4133739, at *3 (M.D. Fla. Sept. 10, 2021) (citing Mahone v. CSX Transp., Inc., 652 F. App'x 820, 823 (11th Cir. 2016); Baroudi v.

Sec'y, U.S. Dep't of Veterans Affairs, 616 F. App'x 899, 905 (11th Cir. 2015)).

Construed in the light most favorable to Plaintiff, the record reveals that Mott called Plaintiff the n-word twice, prefacing it with "stupid" on one occasion; told Brockman and others in the clinic she would be "getting rid of" Plaintiff; excluded Plaintiff from Brockman and Epley's interview process and training; invited Brockman and Epley, but not Plaintiff, to lunch; sporadically told Plaintiff to work in the front office while Plaintiff was working on clinical tasks; issued Plaintiff a written warning regarding her negative attitude; refused Plaintiff's attempts to help her; asked Plaintiff sometimes repetitive questions on a daily basis; and asked Adams to submit a HR complaint about Plaintiff. (Doc. 20-2, at 39-40, 178; Doc. 35, at 4-5; Doc. 37-2, at 7-10; Doc. 38-2, at 2.) Furthermore, the record contains evidence that, in September 2021, Plaintiff informed Turner she believed Mott was discriminating against her because of her race and had called her the n-word, but Turner later told Plaintiff she "might as well suck it up" because of Mott's impending departure. (Doc. 20-2, at 47; Doc. 34-15, at 11.)

Defendant argues most of the harassment of which Plaintiff complains was "rude but trivial conduct" and, therefore, not actionable. (Doc. 34, at 17.) While admittedly severe, Defendant contends Mott's alleged use of the n-word is also not actionable

15

because Mott used the word twice in a three-month period, and no one else was present. (Id. at 19.) Defendant also points out that Plaintiff is not even entirely sure she heard Mott correctly. (Id.) Plaintiff asserts Mott's calling her the n-word was objectively severe because it was directed at Plaintiff by her supervisor. (Doc. 37, at 11-12.) Plaintiff also argues Mott's "efforts to sabotage [Plaintiff's] employment" and Defendant's failure to address the harassment further weigh in favor of finding the harassment objectively severe.[2] (Id. at 12-13.)

For the following reasons, the Court finds Plaintiff does not show a question of material fact exists as to whether the alleged harassment was objectively severe and pervasive.

First, the conduct was not severe. Plaintiff asserts that Mott's two-time use of the n-word toward her is itself sufficient to establish severity. (Doc. 37, at 11-12.) Though an isolated, one-time use of the n-word is insufficient to establish severe or pervasive harassment, Cooler v. Layne Christensen Co., 710 F. App'x 842, 848 (11th Cir. 2017) (citation omitted), the word "is particularly egregious when directed toward a person in an

---

[2] Though Plaintiff points to Mott's use of the n-word in the presence of other coworkers as evidence of objectively severe harassment, only instances of which Plaintiff was aware at the time are relevant to the objective component. (Doc. 37, at 12); Adams, 754 F.3d at 1245 (holding that "an employee alleging a hostile work environment cannot complain about conduct of which he was oblivious for the purpose of proving that his work environment was objectively hostile"). For this same reason, evidence of Mott's emails to Dr. Friedman, Margie Synenberg, and Turner regarding her concerns about Plaintiff are not relevant here, as there is no evidence Plaintiff was aware of these emails while employed by Defendant. (Doc. 39.)

offensive or humiliating manner," <u>Smelter v. S. Home Care Servs.</u>
<u>Inc.</u>, 904 F.3d 1276, 1286 (11th Cir. 2018) (citation omitted).  In
<u>Smelter</u>, a coworker used the n-word "as a means of insulting [the
plaintiff] in the midst of an argument" after the plaintiff "had
endured racist comments on a daily basis" for two months.  904
F.3d at 1286.   The Eleventh Circuit dismissed the employer's
argument that the coworker's use of the n-word in that context was
not severe.  <u>Id.</u>  Here, however, Plaintiff admits she is "not 100
percent sure" she heard Mott correctly, and no one else was around
on either occasion who may have overheard.   (Doc. 20-2, at 16,
23.)  Beyond the fact that Mott *might* have used the n-word on these
two occasions, Plaintiff offers no evidence she was aware of other
facially race-based harassment in the workplace, making this case
quite distinguishable from <u>Smelter</u>.   Thus, the Court finds the
possibility that Mott directed the n-word at Plaintiff two times,
with no one else around, not in the midst of an argument or
confrontation, and when Plaintiff had not experienced any other
race-based slurs, does not constitute objectively severe
harassment.

Mott's remaining conduct about which Plaintiff complains –
such as raising her voice, telling Plaintiff's subordinates not to
listen to her and that she wanted to get rid of Plaintiff,
sporadically asking Plaintiff to work the front desk, issuing
Plaintiff a write-up for her attitude, not inviting Plaintiff to

lunch, asking Adams to submit a HR complaint, and asking Plaintiff questions – also does not amount to objectively severe harassment. (Doc. 20-2, at 39-40, 178; Doc. 35, at 4-5; Doc. 37-2, at 7-10; Doc. 38-2, at 2.)  Nor was Turner's comment that Plaintiff should "suck it up" given Mott's impending departure objectively severe. (Doc. 20-2, at 47; Doc. 34-15, at 11.)  First, Plaintiff offers no other evidence apart from the fact Mott may have previously used the n-word to "establish a connection between her race or color and [these other instances of] allegedly harassing behavior." Troupe v. DeJoy, 861 F. App'x 291, 295 (11th Cir. 2021).  Even assuming Mott did use the n-word, such that a jury could infer her other conduct was racially motivated, neither her other conduct nor Turner's comment were objectively severe.  See Harris v. Pub. Health Tr. of Miami-Dade Cnty., 82 F.4th 1296, 1305 (11th Cir. 2023) (no objectively severe and pervasive harassment when plaintiff's supervisors "made one highly offensive comment, micromanaged and excessively monitored her work, solicited peers to report on her violations, made her perform clerical duties, and disbelieved or ignored her complaints of race discrimination").

The conduct's frequency also does not render it objectively severe and pervasive.  Though no single factor is required to meet the objective prong of a hostile work environment claim, courts have noted that frequent instances of conduct that itself is not severe does not give rise to a claim.  See Hausberg, 2021 WL

4133739, at *4 ("The sheer number of events alleged, without facts
demonstrating the requisite severity, is insufficient to support
a hostile work environment claim." (citations omitted)); Baird v.
Gotbaum, 792 F.3d 166, 172 (D.C. Cir. 2015) (finding "a long list
of trivial incidents is no more a hostile work environment than a
pile of feathers is a crushing weight"); O'Brien v. Dep't of
Agric., 532 F.3d 805, 809 (8th Cir. 2008) ("Appellants seem to
argue that the sheer number of alleged instances of harassment
must equate to a racially hostile work environment. We
disagree."). Thus, even assuming Mott's conduct was frequent, the
Court finds this would not, without more, make her conduct
actionable.

Regarding the third factor, Mott did not physically threaten
Plaintiff. And though her alleged conduct may have been hurtful
or embarrassing to Plaintiff, the Court finds it does not amount
to what courts in the Eleventh Circuit have found to be objectively
humiliating conduct. See Nelson v. Keep Smiling Dental, P.A., No.
8:21-CV-189, 2022 WL 485244, at *6 (M.D. Fla. Feb. 17, 2022)
(finding humiliating conduct when plaintiff's supervisor called
her a "stupid black bitch," made a comment about "colored people
time" when plaintiff was late, and told plaintiff she would get
fat if she kept eating "that n---- food"); Smelter, 904 F.3d at
1287 (finding Black female plaintiff experienced humiliating
conduct when her coworker called Black people "the scum of the

19

earth," told plaintiff she looked like a "mixed monkey," and said Black people should be "sent back to Africa;" she was the target of racial slurs every day; and another coworker called her a "dumb black n-----"); <u>Adams</u>, 754 F.3d at 1251-52 (finding conduct humiliating when "racist graffiti in the men's restroom depicted [plaintiff], the caption included a threatening and humiliating racial slur, and [plaintiff's] supervisor told her about the drawing while pretending to masturbate").

Finally, Plaintiff points to no evidence showing the conduct unreasonably interfered with her job performance. To the contrary, Dr. Friedman reported having no performance issues with Plaintiff during this time. (Doc. 34-5, at 10.) This factor, therefore, also does not weigh in favor of objectively severe and pervasive harassment.

In short, while Plaintiff may have subjectively perceived the complained-of conduct as severe and pervasive race-based harassment, the Court finds there is no question of material fact as to whether it was objectively so. Therefore, Plaintiff fails to establish an essential element of her prima facie hostile work environment claim, and the Court need not address the Parties' arguments as to liability. Defendant's motion for summary judgment as to the hostile work environment claim in Count One is **GRANTED**.

20

b. *Constructive Discharge*

Next, Defendant moves for summary judgment as to Plaintiff's § 1981 constructive discharge claim. (Doc. 34, at 22-23.)

Constructive discharge occurs when an employer deliberately makes an employee's working conditions so intolerable that the employee is forced to resign involuntarily. Bryant v. Jones, 575 F.3d 1281, 1298 (11th Cir. 2009). To prevail, a plaintiff must prove "the work environment and conditions of employment were so unbearable that a reasonable person in that person's position would be compelled to resign." Id. (citation omitted). Constructive discharge demands the plaintiff show a greater severity or pervasiveness of harassment than that required for a hostile work environment claim. Id. at 1298-99 (citation omitted).

Plaintiff argues the following evidence creates a triable issue of fact exists as to whether a reasonable person in her position would have been compelled to resign: Mott directed racial harassment toward Plaintiff, which Defendant knew of and failed to properly address; Defendant asked Plaintiff to perform additional duties as interim office manager with no increase in pay; Defendant refused to interview Plaintiff for the permanent office manager position; and Plaintiff had to supervise staff whom Mott had instructed not to listen to Plaintiff. (Doc. 37, at 24.) Plaintiff compares these facts to those in Poole v. Country Club of Columbus, Inc., where a jury question existed as to constructive

21

discharge when an employee was "[s]tripped of all responsibility, given only a chair and no desk, and isolated from conversations with other workers." (Id. (citing 129 F.3d 551, 553 (11th Cir. 1997).)

Defendant contends the delay in time between Mott's departure and Plaintiff's resignation precludes Plaintiff from establishing she resigned because of Mott's harassment. (Doc. 34, at 22; Doc. 41, at 8-9.) Defendant also argues its failure to promote Plaintiff does not amount to a constructive discharge. (Doc. 34, at 23.)

The Court finds the evidence does not create a triable issue as to whether Plaintiff was constructively discharged. First, the Court already found Mott's conduct was not sufficiently severe and pervasive to give rise to a hostile work environment claim, so her conduct cannot serve as the basis for constructive discharge. Furthermore, the Court finds this case readily distinguishable from Poole: Plaintiff testified her work responsibilities increased during the months before her resignation, and there is no evidence the physical conditions of her workspace changed. (Doc. 20-2, at 53.) While Plaintiff alleges Mott instructed Brockman and Epley not to listen to Plaintiff, she also claims Brockman disclosed this to her before Mott's resignation, which suggests Mott's instruction did not impact Plaintiff's working relationship with Brockman for more than a couple of months. (Id.

at 32, 36.) Finally, Plaintiff may have understandably been disappointed not to have been considered for the permanent office manager position, but Defendant's decision not to interview Plaintiff did nothing to change her work conditions such that a reasonable person would be compelled to resign.

For these reasons, Plaintiff has not established a question of material fact exists as to whether she was constructively discharged. Therefore, the Court **GRANTS** Defendant's motion to dismiss her constructive discharge claim in Count One.

c. *Failure to Consider Plaintiff for Manager Position*

Plaintiff asserts a § 1981 race discrimination claim based on Defendant's failure to consider her application for the permanent office manager position. (Doc. 5, at 10.) Defendant argues this claim fails as a matter of law because Plaintiff was not qualified for the permanent office manager position and Defendant did not hire an equally or less-qualified applicant for the position. (Doc. 34, at 23-24.)

"Section 1981 prohibits intentional race discrimination in the making and enforcement of public and private contracts, including employment contracts." Jenkins v. Nell, 26 F.4th 1243, 1249 (11th Cir. 2022) (citations omitted). "A plaintiff may use either direct evidence or circumstantial evidence to show race discrimination." Id. (citation omitted). Direct evidence is "evidence which reflects a discriminatory or retaliatory attitude

23

correlating to the discrimination or retaliation complained of by the employee." Damon v. Fleming Supermarkets of Fla., Inc., 196 F.3d 1354, 1358 (11th Cir. 1999) (citations and quotation marks omitted). Direct evidence must "prove[ ] the existence of discriminatory intent without inference or presumption." Jefferson v. Sewon Am., Inc., 891 F.3d 911, 921 (11th Cir. 2018) (alterations adopted and citation omitted).

The McDonnell Douglas Corp. v. Green framework generally governs the use of circumstantial evidence in employment discrimination cases. 411 U.S. 792 (1973). Under McDonnell Douglas, the plaintiff has the burden to establish a prima facie case of discrimination. Jenkins, 26 F.4th at 1249. To establish a prima facie case of discrimination, the plaintiff must show: "(1) he belongs to a protected class; (2) he suffered an adverse employment action; (3) he was qualified to perform the job in question; and (4) his employer treated 'similarly situated' employees outside his class more favorably." Id. (citation omitted). If the plaintiff establishes a prima facie case, "the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its actions." Lewis v. City of Union City, 918 F.3d 1213, 1221 (11th Cir. 2019) (citation omitted). If the defendant carries its burden, the "plaintiff must then demonstrate that the defendant's proffered reason was merely a pretext for unlawful discrimination, an obligation that 'merges

24

with the plaintiff's ultimate burden of persuading the factfinder that [ ] he has been the victim of intentional discrimination.'" Id. (quoting Tex. Dep't of Cmt'y. Affairs v. Burdine, 450 U.S. 248, 256 (1981)) (alterations adopted). While a plaintiff need not "prove that race was the *exclusive* cause of [the adverse employment action], . . . it does require a plaintiff to prove that but for his or her race, the plaintiff would not have [suffered the adverse employment action]." Phillips v. FedEx Ground Package Sys., Inc., No. 23-10005, 2024 WL 1191819, at *3 (11th Cir. Mar. 20, 2024) (citation omitted).

The Parties contest the second and fourth elements required for a prima facie case. Plaintiff contends she established a prima facie case because (1) Defendant's refusal to consider her application for the permanent manager position constituted an adverse employment action, and (2) Defendant offered Sarah Braddock, who had no previous managerial or supervisory experience, an interview for the manager position. (Doc. 37, at 17-18.) Defendant argues Plaintiff's claim fails because refusing to interview Plaintiff does not constitute an adverse employment action, Braddock cannot serve as a comparator since she was given neither a final interview nor the job itself, and undisputed evidence shows Defendant interviewed an African American for the same position before offering him the Chief Operating Officer position instead. (Doc. 41, at 10.)

Defendant also argues that even if Plaintiff can make out a prima facie case of discrimination, her claim nonetheless fails because the true reason Defendant did not consider her for the office manager position was her attitude and lack of leadership skills. (Id. at 13-14.) Plaintiff argues Defendant's proffered nondiscriminatory reason is pretextual because Braddock was offered an interview despite having no management experience; Mott did not have the requisite managerial experience listed in the office manager job posting when she was hired; Dr. Friedman did not have concerns with Plaintiff's job performance; and Defendant's prior Chief Operating Officer supported Plaintiff for the position. (Doc. 37, at 19-20.)

Plaintiff does not point the Court to, nor is the Court aware of, Eleventh Circuit precedent explicitly identifying failure to interview as an adverse employment action. However, even assuming without deciding that Defendant's failure to interview Plaintiff constituted an adverse employment action, such that Braddock can serve as an appropriate comparator, the Court would still find in favor of Defendant because Plaintiff has not established that but for her race, she would have received an interview for the office manager position.

In support of Defendant's proffered nondiscriminatory reason, multiple witnesses testified that Plaintiff would not have been a good fit for the permanent office manager position: Turner, who

thought Plaintiff should have received an interview as an acknowledgment of Plaintiff's assumption of extra duties following Mott's departure, nonetheless "wouldn't have hired her" because of her "attitude" and the fact that she "wasn't very approachable when in the office." (Doc. 34-15, at 16; Doc. 37-2, at 23.) Defendant's HR director, Margie Synenberg, whom Plaintiff asserts made the decision not to offer her an initial interview, "did not think [Plaintiff] had good leadership skills or that she would be a good fit for the . . . position" based on Plaintiff's issues with Mott and "other employees' complaints that [she] was hard to work with." (Doc. 34-9, at 4-5; Doc. 37, at 20.)  And other employees did complain: on September 16, 2021, Brockman emailed Mott and Turner about her concerns related to Plaintiff's "attitude toward staff;" Epley found Plaintiff "rude and disrespectful," and emailed Mott on September 19, 2021, that she felt uncomfortable asking Plaintiff for help because "she huffs & speaks to you as though your [sic] dumb." (Doc. 34-7, at 2; Doc. 34-8, at 2-3.) While Plaintiff contends Mott wrote the email that came from Brockman, she never contends Brockman's complaint itself was "false." (Doc. 20-2, at 41.)

Those involved in the hiring process also felt Plaintiff was not prepared for the permanent office manager job.  Dr. Friedman, who made the ultimate hiring decision, "did not believe that [Plaintiff] was ready to be the Office Manager" based on her

limited management experience. (Doc. 34-6, at 2.) Though Dr. Suykerbuyk encouraged Plaintiff to apply so she could "go through the process, learn from it," he himself was concerned Plaintiff didn't have "enough management experience . . . to become an office manager." (Doc. 34-12, at 17.) And Defendant's Chief Operating Officer, who himself wanted to interview Plaintiff for the position, "ultimately could not offer [her] an interview for the permanent office manager position because Dr. Suykerbuyk and Dr. Friedman, who had the final say, did not support her application."[3] (Doc. 38-3, at 2.)

In sum, because evidence shows key decisionmakers knew Plaintiff had been the subject of employee complaints and felt she lacked necessary qualifications, the Court does not find Defendant's proffered reasons for not interviewing Plaintiff "demonstrate[] such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions . . . that a reasonable factfinder could find them unworthy of credence." Combs v. Plantation Patterns, 106 F.3d 1519, 1538 (11th Cir. 1997)

---

[3] The Court acknowledges that some of this evidence pertains to whether Plaintiff would have ultimately been *hired* for the office manager position, whereas the presumed adverse action here is Defendant's failure to *interview* Plaintiff for that position. But the Court nonetheless finds that evidence that Defendant had legitimate non-discriminatory reasons not to hire Plaintiff is relevant: after all, it seems a failure to interview could only be actionable under § 1981 to the extent it could have affected the "making and enforcement of [an] employment contract[]." Jenkins, 26 F.4th at 1249 (citations omitted). Thus, evidence that Dr. Friedman, who had worked with Plaintiff and made the final hiring decision, would not have ultimately hired Plaintiff suggests that Defendant's failure to interview her was *not* the reason she was not hired for the office manager position.

(citation and internal quotation marks omitted). Defendant's motion for summary judgment is therefore **GRANTED** as to Plaintiff's § 1981 race discrimination claim in Count One.

    2. Count Two: 42 U.S.C. § 1981 Retaliation

Count Two asserts Defendant took various retaliatory actions against Plaintiff because she complained of race discrimination. (Doc. 5, at 12-14.) Defendant argues it is entitled to summary judgment on Count Two because Plaintiff cannot make a prima facie showing of retaliation. (Doc. 34, at 24.)

Courts apply the McDonnell Douglas framework to retaliation claims that rely on circumstantial evidence. Moss v. St. Vincent's Health Sys., No. 22-13956, 2024 WL 729953, at *4 (11th Cir. Feb. 22, 2024) (citation omitted). "To establish a *prima facie* case of retaliation, a plaintiff must show that (1) she engaged in a statutorily protected activity; (2) she suffered an adverse employment action; and (3) there is a causal link between the protected activity and the adverse action." Id. (citation omitted). Regarding the first element, Section 1981 protects "individuals who explicitly or implicitly communicate a belief that [an employment] practice constitutes unlawful employment discrimination." Furcron v. Mail Centers Plus, LLC, 843 F.3d 1295, 1311 (11th Cir. 2016) (citation omitted). The plaintiff must show she "had a good faith, reasonable belief that the employer was engaged in unlawful employment practices." Id. (citation

omitted). For the second element, a plaintiff suffers an adverse employment action for the purposes of a retaliation claim when the challenged action "might have dissuaded a reasonable worker from making or supporting a charge of discrimination." Moss, 2024 WL 729953, at *4 (citing Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 68 (2006)). Once the plaintiff establishes a prima facie case, "[t]he burden of production then shifts to the employer to rebut the presumption by articulating a legitimate, non-discriminatory reason for the employment action." Gogel v. Kia Motors Mfg. of Ga., Inc., 967 F.3d 1121, 1135 (11th Cir. 2020) (citation omitted). The plaintiff may overcome such rebuttal only by showing "that the proffered reason was merely a pretext to mask retaliatory actions." Id. (citation and internal quotation marks omitted and alteration adopted). "In other words, a plaintiff must prove that had she not engaged in the protected conduct, she would not have been fired." Id. (citation and internal quotation marks omitted and alteration adopted).

Plaintiff contends the following establishes a prima facie case of retaliation: (1) she complained to Turner in September 2021 that she was experiencing race discrimination from Mott; (2) Defendant excluded her from consideration for the office manager position; and (3) Synenberg knew of Plaintiff's complaint when Plaintiff submitted her office manager application less than two months later. (Doc. 37, at 22-23.)

Even assuming Plaintiff establishes her prima facie case of retaliation, the Court finds it fails for similar reasons as her race discrimination claim. Plaintiff cannot overcome Defendant's legitimate, nondiscriminatory reason for not offering her the interview — that her attitude had generated multiple employee complaints and decisionmakers felt she was not prepared for the job. Therefore, Defendant's motion for summary judgment is **GRANTED** as to Plaintiff's retaliation claim.

### 3. Count Three: Punitive Damages

Plaintiff's claim for punitive damages is derivative of her discrimination and retaliation claims. (Doc. 5, at 14.) Therefore, because the Court has granted Defendant's motion for summary judgment on those claims, Plaintiff is not entitled to punitive damages as asserted in Count Three. (Id.); see Mann v. Taser Int'l, Inc., 588 F.3d 1291, 1304 (11th Cir. 2009) ("A punitive damages claim is derivative of a plaintiff's tort claim, and where a court has dismissed a plaintiff's underlying tort claim, dismissal of a plaintiff's punitive damages claim is also required").

### III. ATTORNEY'S FEES AND COSTS

Finally, the Court turns to Defendant's requests for attorney's fees and costs incurred in litigating its motion for sanctions. (Doc. 43.) Defendant requests $14,925.05. (Id. at

3.)    Of that, $13,486.50 represents attorney's fees billed to Defendant from May 22, 2024, through September 10, 2024, for time spent solely on Defendant's motion for sanctions and related briefing.    (Id.)    An additional $66.05 represents the amount Plaintiff's OB/GYN provider charged Defendant's counsel to produce medical records pursuant to a subpoena.    (Id.)    Finally, nine block billed time entries reflect charges for time spent in connection with the motion for sanctions and other tasks in this case.    (Id.) Attorney John E. Price represents that while most of the block billed time was spent addressing the motion for sanctions, Defendant seeks to recover half of the total fees reflected in these entries, or $1,372.50.    (Id.)

The records reflect that paralegal Carla Woodward performed six hours of sanctions-related work, of counsel attorney Dorothy Hogg performed 15.6 hours, and Price, who is a partner, performed 37.7 hours.    (Id. at 2-3; Doc. 43-1.)    Defendant's counsel billed at $155/hour for Woodward, $275/hour for Hogg, and, initially, $310/hour for Price.    (Doc. 43, at 2.)    Beginning June 18, 2024, Price's work was billed at $275/hour to help control legal expenses once it became apparent that the case would require extensive involvement by Hogg and Price.    (Id.)

An award of fees must be reasonable and fall within the guidelines the Eleventh Circuit has promulgated.    See Norman v. Housing Auth. of Montgomery, 836 F.2d 1292 (11th Cir. 1988).    The

Eleventh Circuit has adopted the lodestar method for determining reasonable attorney's fees. Id. at 1299-1302. The "lodestar" is determined by multiplying an attorney's reasonable hourly rate by the number of compensable hours reasonably expended. Bivins v. Wrap It Up, Inc., 548 F.3d 1348, 1350 (11th Cir. 2008). "A reasonable hourly rate is the prevailing market rate in the relevant legal community for similar services by lawyers of reasonably comparable skills, experience, and reputation." Norman, 836 F.2d at 1299 (citations omitted). Generally, the "relevant legal community" is that of the place where the case is filed. Cullens v. Ga. Dep't of Transp., 29 F.3d 1489, 1494 (11th Cir. 1994) (citation omitted). Because the Court is itself considered an expert on hourly rates in the community, it may consult its own experience in forming an independent judgment. Loranger v. Stierheim, 10 F.3d 776, 781 (11th Cir. 1994). The relevant legal market for this Court is the Augusta legal market, where the reasonable rate for more experienced attorneys is $450/hour, for other attorneys is $315/hour, and for paralegals is $150/hour. See Jackson v. Johnson, No. CV 123-074, Doc. 18 (S.D. Ga. Aug. 31, 2024); Whitesell Corp. v. Electrolux Home Prod., Inc., No. CV 103-050, 2021 WL 9316401, at *2 (S.D. Ga. July 20, 2021).

The Court finds the time expended in litigating Defendant's motion for sanctions is reasonable. Defendant's motion and related briefing required an extensive review of Plaintiff's medical

records, pleadings, deposition testimony, and other evidence.
(See Docs. 20, 30, 31, 43-1.)    Defendant's briefings show its
counsel thoroughly researched the legitimacy of its motion and
developed arguments for imposing sanctions under multiple
authorities.  (See Docs. 20, 30, 31.)

As to Defendant's requested fees, the Court notes that
Woodward's fee of $155/hour slightly exceeds what the Court has
previously found reasonable.  See Whitesell, 1:03cv050, Doc. 1482,
at 4 (S.D. Ga. July 20, 2021).  However, given that the fees for
work performed by Price and Hogg are less than the reasonable rate
for the Augusta market, the Court is willing to award the full
amount requested.  Defendant is entitled to $14,925.05 for costs
and fees incurred while litigating its motion for sanctions.


**IV. CONCLUSION**

For the foregoing reasons, Defendant's motion for summary
judgment (Doc. 34) is **GRANTED**, and Plaintiff **SHALL PAY** Defendant
$14,925.05 for the costs and fees incurred while litigating its
motion for sanctions.  The Clerk is **DIRECTED** to **ENTER JUDGMENT** in
favor of Defendant, **TERMINATE** all pending motions, and **CLOSE** this
case.

**ORDER ENTERED** at Augusta, Georgia, this 5th day of September, 2025.

_____
HONORABLE J. RANDAL HALL
UNITED STATES DISTRICT JUDGE
SOUTHERN DISTRICT OF GEORGIA